## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| HDR HOLDING, INC., *et al.* [1] | Case No.:  19-335; 8 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF CRAIG MAYMAN IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

I, Craig Mayman, hereby declare under penalty of perjury that the following is true and correct:

1.      I am the President of HDR Holding, Inc., a Delaware corporation ("HDR"), and Schramm, Inc., a Pennsylvania corporation ("Schramm," and together with HDR, the "Debtors").  I was appointed as President of the Debtors on September 11, 2018.

2.      In my capacity as President, I am familiar with the Debtors' operations, day-to-day business affairs, and books and records.  I submit this declaration (this "Declaration") to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of these chapter 11 cases (collectively, the "Chapter 11 Cases"), and in support of the Debtors' petitions and motions requesting various types of "first day" relief (collectively, the "First Day Motions").

3.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions with the Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: HDR Holding, Inc. (2015) and Schramm, Inc. (0480).  The Debtors' mailing address is 800 E. Virginia Ave., West Chester, PA 19380.

properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  No trustee or examiner has been appointed in the Chapter 11 Cases.  As of the date hereof, no creditors' committee has been appointed.

4.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with members of the Debtors' senior management, and information provided to me by the Debtors' counsel, Young Conaway Stargatt & Taylor, LLP.  I am authorized by the Debtors to submit this Declaration.  If I were called upon to testify, I would testify competently to the facts set forth herein.

5.      As described in further detail below, the Debtors filed the Chapter 11 Cases to maximize the value of their estates for the benefit of all their stakeholders through the sale of their businesses.  The Debtors together with their non-debtor affiliates (collectively, the "Company") are a leading global manufacturer and supplier of branded land-based hydraulic drills and equipment to the mining, oil and gas, water and other end-markets.  Unfortunately, due to the challenges discussed herein, the Debtors have been unable to satisfy their obligations under their secured credit facilities and are facing near-term liquidity issues.  To address these challenges, the Debtors and their professional advisors, after considering all available strategic options, have determined that the best course to maximize the value of the Debtors' estates is to initiate the Chapter 11 Cases for purposes of effectuating the sale of the Company as a going concern, while preserving the value of their assets, maintaining their business operations for the benefit of vendors and service providers, and ensuring that employees will be able to keep their

jobs on substantially the same terms and conditions under which they are currently employed, which will maximize the value of the Debtors' assets for creditors.

6.      I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe that the relief sought in each First Day Motion:  (i) will enable the Debtors to transition into chapter 11 without damaging the value of the Debtors' business; (ii) is critical to the Debtors' efforts to maximize value through the Chapter 11 Cases and maintain a viable business; and (iii) best serves the interests of the Debtors' estates and creditors.  It is my further belief that the relief sought in the First Day Motions is, in each case, narrowly tailored and necessary to achieve the goals identified above.

7.      This Declaration provides an overview of the Debtors' business and corporate history, as well as a discussion of the events that compelled the commencement of the Chapter 11 Cases, a description of the Debtors' capital structure, the Debtors' strategy to maximize the value of their business, and their efforts to obtain debtor-in-possession financing. The Declaration also affirms and incorporates the facts that support the relief requested in the First Day Motions.

## A.      Overview of the Debtors

8.      Founded in West Chester, Pennsylvania in 1900 by Chris Schramm as a producer of industrial equipment and headquartered there to this day, the Company has over the last century built a leading reputation in the global marketplace by offering a comprehensive suite of state-of-the-art rigs and highly-engineered parts that make exploration drilling safer and more efficient. The Company's products are sold on every continent, and the Company and its products maintain major market positions in China, Australia, Russia, Latin America, and Africa. Its customers include some of the largest rig operators in the world.

9.     The Company specializes in the manufacture and sale of a variety of mobile, top-head hydraulic rotary drilling rigs that are mounted on trucks, tracks and trailers. These rigs are used primarily within the mining, oil and gas, and water end-markets where performance is critical. The Company's various rig models provide drillers with a variety of options depending on the type of drilling being conducted, the required drilling depths, and the terrain surrounding the drilling site.   In addition, the Company sells consumable drill parts required for the operation of Schramm rigs that naturally deteriorate as part of the drilling process (often referred to as "hammers and bits"), as well as other ancillary equipment.  Further, the Company provides rig repair services to several of its customers on an as-needed basis.

10.     HDR is a holding company and the direct parent of Schramm, owning 100% of the equity in Schramm.  Schramm is the direct parent of non-debtor Schramm Australia Holding Pty Limited ("Schramm Australia"), owning 100% of the equity in Schramm Australia. Schramm Australia is the direct parent of two Australian non-debtor affiliates (Airdrill Pty Ltd and Airdrill Hammers and Bits Pty Ltd), owning 100% of the equity in such entities, which entities manufacture and sell drills in the Australian market and manufacture hammers and bits for Schramm drills.[2]

## B.     The Prepetition Capital Structure.

11.     The Debtors' most significant sources of liquidity consist of cash generated from working capital, borrowings under the Amended Credit Agreement (defined below) and borrowings from GenNx360 (as defined below).  As of the Petition Date, the Debtors

---

[2] For the avoidance of doubt, Schramm Australia and its subsidiaries are not parties to these Chapter 11 Cases or any case seeking protection from their creditors.  The operations of Schramm Australia are contemplated to continue in the ordinary course during these Chapter 11 Cases.

have not less than approximately $20 million in outstanding secured debt obligations.  The significant liabilities of the Debtors are described in greater detail below.

> ### i.    2012 Credit Agreement

12.    The Debtors were parties to that certain Credit Agreement, dated as of June 29, 2012 (as amended, the "2012 Credit Agreement") with Citizens Bank, N.A., as administrative agent ("Citizens"), which provided the Debtors with a $72,000,000 secured credit facility.  As a result of the Debtors' inability to repay various obligations under the 2012 Credit Agreement in addition to other events of default related to financial covenants, the Debtors and Citizens entered into a Forbearance and Amendment Agreement on August 29, 2014 (the "First Forbearance Agreement"), which provided the Debtors with a forbearance from Citizens' right to exercise certain remedies through June 30, 2015.

13.    As a result of additional events of default related to minimum liquidity and failure to meet additional financial covenants in the First Forbearance Agreement, on March 19, 2015, the Debtors and Citizens entered into the Second Forbearance Agreement (the "Second Forbearance Agreement"), under which Citizens agreed to forbear from exercising certain remedies through April 30, 2015.  As part of the Second Forbearance Agreement, GenNx360 Capital Partners, L.P. ("GenNx360"), the holder of the majority of the equity interests in HDR, made a loan to the Debtors in the amount of $2,000,000.

14.    On June 5, 2015, the Debtors and Citizens entered into the Third Forbearance and Amendment Agreement (the "Third Forbearance Agreement") as a result of continuing liquidity and other financial defaults.  Pursuant to the Third Forbearance Agreement, Citizens agreed to forbear from exercising certain remedies through June 30, 2016, during which period the Debtors sought to refinance their obligations under the 2012 Credit Agreement.  As

part of the Third Forbearance Agreement, GenNx made an additional $4,000,000 loan to the Debtors which loan was *pari passu* with the obligations owed to Citizens under the 2012 Credit Agreement, provided however that Citizens was entitled to the first payment of proceeds from the sale of certain existing rig inventory (the "Third Forbearance Term Loan").

      ii.     **Amended Credit Agreement**

      15.     On March 23, 2016, the Debtors, Enhanced Credit Supported Loan Fund, LP, now known as Hark Capital ("Hark"), and the Lenders from time to time party thereto (including Citizens and GenNx360) entered into that certain Amended and Restated Credit Agreement (the "Amended Credit Agreement").   In connection with the Amended Credit Agreement, Hark (i) acquired debt issued under the 2012 Loan Agreement in the outstanding principal amount of $20,641,071.18, (ii) agreed to forgive an amount of the loans under the Original Loan Agreement in an amount sufficient to reduce the outstanding amount of such loans held by Hark to $12,300,000, and (iii) agreed to make an additional term loan to the Debtors in the amount of $1,200,000.  The amounts owed to Hark ($12,300,000 plus $1,200,000) constitute first-priority Term Loan A obligations under the Amended Credit Agreement.   GenNx360 executed a guaranty of the Debtors' Term Loan A obligations in favor of Hark (the "Guaranty").

      16.     GenNx360 agreed to forgive the Third Forbearance Term Loan and to acquire loans issued under the 2012 Loan Agreement in the outstanding principal amount of $6,500,000, which obligation constitutes a second-priority Term Loan B under the Amended Credit Agreement, junior to the Term Loan A obligations owed to Hark under the Amended Credit Agreement.

      17.     Citizens, on behalf of certain of the lenders under the 2012 Loan Agreement, agreed to forgive an amount of the remaining loans under the Original Loan

Agreement in an amount sufficient to reduce the outstanding amount of such loans held by such lenders to $6,000,000 and in connection therewith, were issued warrants in the Debtors. The remaining $6,000,000 obligation constitutes a third-priority Term Loan C under the Amended Credit Agreement, junior in priority to both the Term Loan A and Term Loan B.

18.     On June of 2019, under the terms of the Guaranty, GenNx360 made a payment to Hark in the amount of $11,000,029.00 in partial satisfaction of the Term Loan A.

## C.     Circumstances Leading to the Commencement of These Chapter 11 Cases

19.     Given its strong connections to the oil and gas industry, the Company has faced significant challenges pervasive in the industry over the past three to five years. Numerous oil and gas producers have significantly curtailed, if not entirely ceased, drilling new wells in response to declines in commodity prices that make such projects uneconomical. The result of this trend for the Company has been a reduced demand for both new rigs and for the related consumable drill parts as existing rig assemblies are idled, which has led to the Debtors failing to meet revenue projections and maintain compliance with the covenants under their prepetition credit facilities.

20.     In an attempt to weather these industry challenges, the Company has shifted its focus to a steadier mining sector, and has additionally focused its efforts on the sale of aftermarket equipment and refurbished rigs in order to be best positioned to meet the needs of its customers. At the same time, the Company has also managed its workforce and expenses carefully in order to conserve cash until an anticipated recovery in the oil and gas market. These initiatives helped to improve the Company's performance, allowing it to double revenue from 2016 to 2017 and generate significantly improved EBITDA in 2018. Nonetheless, the Debtors' financial performance has continued to be strained. The primary hurdles to the Debtors' success

are macroeconomic issues outside of their control and the Debtors' unsustainable capital structure.

21.     Over the past eight months, the Debtors have been exploring a potential sale transaction or refinancing.  The Debtors' proposed investment banker, FocalPoint Partners LLC, contacted 146 strategic and financial investors regarding potential transactions.  Of those parties, two (2) parties submitted indicative non-binding term sheets.  One indicative term sheet sought to structure a transaction solely involving the acquisition of the Debtors' secured debt along with some contingent consideration.  While the other party originally contemplated a cash investment into the Debtors, along with a restructuring of the Debtors' secured debt, after further diligence and discussions, this interested party indicated it would be only willing to provide such investment in connection with an acquisition of the secured term loan debt which it would use to bid on the Debtors' assets in a court-supervised sale process.  Ultimately, even this party chose to pass on the investment opportunity.

22.     As their funds dwindled and no third-party acquirer emerged with a concrete proposal to satisfy the Debtors' secured obligations, the Debtors were faced with the specter of immediately ceasing operations, laying off their remaining employees, and beginning a liquidation process.  Obviously, a liquidation of the business would be devastating to the Debtors' employees, many of whom have worked for the Company for many years, and would likely only provide limited recoveries to the Debtors' secured lenders.  In addition, such a course of action would be highly damaging to customers who rely on the Debtors to provide them with continued service and warranties on their products, and to the Debtors' vendors, many of which are small, specialized suppliers for whom the Debtors are a key customer.  Presented with this stark reality, the Debtors determined that a going-concern sale of their business in conjunction

with a chapter 11 filing presented the best—indeed, the only—opportunity to preserve their going concern value, save jobs, and maximize recoveries for stakeholders.

23.    After the Debtors carefully considered the indicative term sheets in consultation with their advisors, they determined instead to move forward with a proposal from GenNx360, which proposed to provide debtor-in-possession financing (discussed below) for the Company to run a sale process and agreed to serve as the stalking horse bidder (the "Stalking Horse Bidder") for substantially all of the Debtors' assets.

24.    The Debtors believe that they have a viable business, but their current capital structure is unsustainable.  Based on the preliminary indications of interest that the Debtors have received, it is possible that a sale transaction may not generate sufficient proceeds to cover the full amount of the Debtors' current secured debt.

25.    To address these issues, the Debtors intend to sell their business as a going concern under section 363 of the Bankruptcy Code, including free and clear of liens, claims, and encumbrances under subsection (f), to an acquirer that will provide the highest or otherwise best bid for the Debtors' assets. In order to advance this process in a manner that ensures continuity of business operations and eliminates value-destroying uncertainty in the marketplace or among the Debtors' employees and vendors, the Debtors negotiated the stalking horse asset purchase agreement with the Stalking Horse Bidder, which agreement ensures the ongoing operation of the business as a going concern – maintaining their business operations for the benefit of vendors and service providers, and ensuring that employees will be able to keep their jobs on substantially the same terms and conditions under which they are currently employed.

26.    The Debtors firmly believe that selling their businesses as a going concern, including with the protections afforded under section 363(f) of the Bankruptcy Code,

will yield the highest recovery to their estates. The alternatives to a going-concern sale that are available to the Debtors at this time would produce a sub-optimal outcome. The Debtors will be requesting that the Court establish the following timeline for their proposed sale process:

| Event | Date |
|---|---|
| Deadline for Entry of the Bidding Procedures Order under the DIP Facility | On or before July 19, 2019 |
| Sale Objection Deadline | August 7, 2019 |
| Bid Deadline – Due Date for Bids, Designation of Contracts and Leases (if applicable) and Deposits | August 13, 2019 at 5:00 p.m. (ET) |
| Auction (if necessary) | August 15, 2019 at 10:00 a.m. (ET) |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder Other than the Stalking Horse Bidder | August 16, 2019 at 4:00 p.m. (ET) |
| Sale Hearing | August 19, 2019 |
| Outside Date for Closing to Occur | September 3, 2019 |

27.    I believe that implementing this sale process, which will allow for additional market-testing during the Chapter 11 Cases, will maximize the value of the Debtors' estates for the benefit of all of their stakeholders.

**D.**    **Post-Petition Financing**

28.    The Debtors require funding to preserve their going concern value, pay their ongoing obligations and continue operations, as their cash reserves have been depleted. During the prior eight months, while the Debtors were pursuing the sale and refinancing alternatives referenced above, the Debtors have relied upon material infusions of cash from GenNx360 in order to maintain operations.  However, without a clear path to an out-of-court transaction that would satisfy the Debtors' secured indebtedness, GenNx360 was unwilling to

continue to infuse cash into the Debtors.  Accordingly, the Debtors determined that initiating the process for marketing the Debtors' assets for sale through these chapter 11 proceedings was necessary to ensure that the Debtors could continue to access sufficient funding to maintain the business as a going concern.

29.     The Stalking Horse Bidder and the Debtors have negotiated for and agreed to postpetition debtor in possession financing in the amount of $6,000,000 (the "<u>DIP Facility</u>"). The DIP Facility is memorialized in a Debtor-in-Possession Delayed Draw Term Loan Promissory Note.  Pursuant to the DIP Facility, the Stalking Horse Bidder is providing the Debtors with funding on favorable terms that I do not believe they could acquire elsewhere.

**E.     <u>Support for Relief Requested in First Day Motions</u>**

30.     Concurrently with the filing of their chapter 11 petitions, the Debtors filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to maximize the value of their estates while the Chapter 11 Cases are pending.  The facts set forth in the First Day Motions are incorporated herein in their entirety.  The Debtors are seeking approval of the First Day Motions to ensure that value is preserved during the transition into chapter 11.

31.     To this end, Debtors have filed the following First Day Motions:

    i.   *Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases;*

    ii.  *Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. § 156(c)(I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtors, Effective Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief;*

    iii. *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies*

*from Altering, Refusing or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Granting Related Relief, Including Setting a Final Hearing Related Thereto;*

iv.  *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363, and 364 of the Bankruptcy Code, (I) Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection With Insurance Programs, Including Payment of Policy Premiums; and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto;*

v.  *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a), and 1108 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto;*

vi.  *Debtors' Motion for Entry of an Order Authorizing (A) the Debtors to (I) Pay Prepetition Employee Wages, Salaries, and Other Compensation, and Related Costs; (II) Pay Prepetition Employee Business Expenses; (III) Contribute to Prepetition Employee Benefit Programs and Continue Such Programs in the Ordinary Course; and (IV) Pay Workers' Compensation Obligations; and (B) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto;*

vii.  *Debtors' Motion for an Order Authorizing (A) Continued Use of Cash Management System; (B) Maintenance of Existing Bank Accounts; (C) Continued Use of Existing Business Forms; and (D) Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Grant of Administrative Expense Status for Postpetition Intercompany Claims;*

viii.  *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363, 1107(a), and 1108 of the Bankruptcy Code (I) Authorizing the Debtors to Pay Certain Pre-Petition Claims of Critical Vendors and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Claims; and*

ix.  *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rule 4001-2: (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Use of Cash Collateral, (III) Granting*

*Adequate Protection to the Prepetition Secured Parties, (IV) Scheduling and Final Hearing, and (V) Granting Related Relief.*

32.    I have reviewed each of the First Day Motions, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors.  It is my belief that the relief sought in each of the First Day Motions constitutes a critical element in the successful implementation of the Debtors' efforts to maximize creditor recoveries, is necessary for a smooth transition into Chapter 11 and will help to preserve the value of the Debtors' estates.  It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, *i.e.* the First Day Motions seeking relief related to the Debtors' obligations to their employees, taxing authorities, vendors, service providers, customers, banks, and insurers, the relief requested is necessary to avoid immediate and irreparable harm to the Debtors' estates.

33.    The success of the Chapter 11 Cases depends upon the Debtors' ability to maintain their operations and maximize estate value.  The relief requested in the First Day Motions is a critical component of maintaining uninterrupted business operations and the confidence of key constituencies necessary to implement a successful chapter 11 process.

## CONCLUSION

34.     I believe approval of the relief requested in the First Day Motions is in the best interests of all stakeholders and respectfully request that the Court grant all relief requested in the First Day Motions and such other further relief as may be just.


Dated:  June 24, 2019                          */s/ Craig Mayman*
                                               Craig Mayman

                                               President